UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

RAOUL TURNER,

        Plaintiff,

v.                                    Case No. 8:23-cv-2673-JLB-SPF

ENSUREM II, LLC,

        Defendant.

_____/

## **ORDER**

On May 31, 2022, Defendant Ensurem II, LLC terminated Plaintiff Raoul

Turner's employment as a Member Services Representative II.  Turner then sued

Ensurem, alleging violations of the Americans with Disabilities Act of 1990, 41

U.S.C. § 12101 *et seq.* ("ADA"), the Florida Civil Rights Act of 1992, Fla. Stat.

§ 760.01 *et seq.* ("FCRA"), the Family Medical Leave Act of 1993, 29 U.S.C. § 2601 *et

seq.* ("FMLA"), and FMLA Interference.  (Doc. 15).  The case is now before the Court

on Ensurem's motion for summary judgment.  (Doc. 37).  Turner responded (Doc.

43), and Ensurem replied (Doc. 47).  After careful review of the parties' briefing, the

entire record, and application of the *McDonnell Douglas* burden-shifting analysis[1]

---

[1] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) (establishing a burden-shifting framework for Title VII discrimination and retaliation claims).

and, in the alternative, the "convincing mosaic of circumstantial evidence"[2]

analysis, Ensurem's Motion for Summary Judgment (Doc. 37) is **GRANTED**.

**BACKGROUND**

Viewing the facts in the light most favorable to Turner, the nonmoving party

here, the facts are as follows: Ensurem is an insurance marketplace and technology

provider that specializes in providing customers with online Medicare options.

(Doc. 37 at ¶ 1); (Doc. 43 at ¶ 1).  On January 13, 2020, Ensurem hired Turner as a

Contact Center Agent in its call center.  (Doc. 37 at ¶ 5); (Doc. 43 at ¶ 5).  Turner's

duties involved making and receiving calls to sell Medicare and other insurance

policies to customers.  (Doc. 37 at ¶ 5); (Doc. 42 at ¶ 5).

Turner received a copy of Ensurem's employee handbook.  (Doc. 38-2 at 123);

(Doc. 37 at ¶ 2); (Doc. 43 at ¶ 2).  The handbook set forth Ensurem's Family and

Medical Leave Act policy, which states that eligible employees may take up to

twelve (12) workweeks of leave in a 12-month period for serious health conditions,

among other things.  (Doc. 38-2 at 127–37); (Doc. 37 at ¶ 3); (Doc. 43 at ¶ 3).  The

handbook also included Ensurem's attendance policy and standards of conduct.

(Doc. 38-2 at 138–39); (Doc. 37 at ¶ 4); (Doc. 43 at ¶ 4).  The attendance policy

provides that employees may be terminated for "[e]xcessive absenteeism or

tardiness" or "[f]ailure to show up or call in for a scheduled shift without prior

approval."  (Doc. 38-2 at 138); (Doc. 37 at ¶ 4); (Doc. 43 at ¶ 4).  Turner understood

---

[2] *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 946 (11th Cir. 2023) (explaining that a plaintiff who cannot meet the *McDonnell Douglas* standard can still prove her case with a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker") (citation omitted).

2

the attendance handbook policies.  (Doc. 38-2 at 13); (Doc. 37 at ¶ 4); (Doc. 43 at ¶ 4).

Turner was required to call Ensurem's "call-out" line before his shift started if he was going to be absent.  (Doc. 38-2 at 138); (Doc. 37 at ¶ 5); (Doc. 43 at ¶ 5).  He testified that he received this instruction during his new-hire training, along with the phone number for the call-out line, which was permanently posted on a whiteboard in the training room.  (Doc. 37 at ¶ 5); (Doc. 43 at ¶ 5).

Turner was also required to comply with Ensurem's "Five9" phone system, which it uses in its call center.  (Doc. 37 at ¶ 6); (Doc. 43 at ¶ 6).  Five9 is a phone system that automatically assigns incoming calls to employees who are in "ready" (*i.e.,* "available") status.  (Doc. 37 at ¶ 6); (Doc. 43 at ¶ 6).  Employees control when they receive incoming calls by setting their status in Five9.  (Doc. 37 at ¶ 6); (Doc. 43 at ¶ 6).  Employees may also manually dial at their discretion.  (Doc. 37 at ¶ 6); (Doc. 43 at ¶ 6).  Employees may set their Five9 status to, among other things:

"Ready" which means the employee is available to receive incoming calls;

"Not Ready" which means the employee cannot receive incoming calls;

"After Call Work" which means the employee is completing work related to the prior call they just completed;

"Training" which means the employee is completing training;

"In a Meeting" which means the employee is in a meeting;

"Break" which means the employee is taking a fifteen-minute break; and

"Lunch" which means the employee is taking a thirty-minute lunch.

3

(Doc. 37 at ¶ 6); (Doc. 43 at ¶ 6). By selecting a status other than "ready," employees indicate to Five9 that they are not available to receive incoming calls and will not be assigned any calls. (Doc. 37 at ¶ 7); (Doc. 43 at ¶ 7). Turner understood this policy and worked primarily from home. (Doc. 37 at ¶ 7); (Doc. 43 at ¶ 7).

During his tenure as a Call Center Agent, on April 28, 2021, Turner received a written warning from his then-supervisor, Doug Cooper, for being absent, tardy, or leaving work early six times in three weeks. (Doc. 38-2 at 145); (Doc. 37 at ¶ 13); (Doc. 43 at ¶ 13).

On June 3, 2021, Turner requested intermittent FMLA leave for adjustment disorder with depression and submitted an FMLA certification form to the human resources director, Jill Brown. (Doc. 38-2 at 170–73); (Doc. 37 at ¶ 8); (Doc. 43 at ¶ 8). Ensurem approved Turner's request for FMLA leave that same day. (Doc. 37 at ¶ 8); (Doc. 43 at ¶ 8).

Two months after his FMLA request, Turner was promoted to Member Services Representative II ("MSR II") on July 26, 2021. (Doc. 37 at ¶ 10); (Doc. 43 at ¶ 10). As an MSR II, Turner's job duties included calling customers and taking incoming calls to retain existing clients, among other things. (Doc. 37 at ¶ 12); (Doc.

4

43 at ¶ 12) (undisputed)[3].   Like his former role, Turner was required to (1) call

Ensurem's call-out line before his shift started when he would be absent; (2)

properly set his status in Five9; (3) be logged onto Five9 for at least eight hours per

day, and (4) take calls for at least six-and-a-half to seven hours per day.  (Doc. 37 at

¶ 12); (Doc. 43 at ¶ 12).[4]  Turner's pay was raised from $20.50 per hour (plus

commission) to $65,000 per year.  (Doc. 37 at ¶ 10); (Doc. 43 at ¶ 10).  In this new

role, Turner reported to then-Member Services Supervisor, Star Owens, who in turn

reported to then-senior vice president Norman DePalantino.   (Doc. 37 at ¶ 10);

(Doc. 43 at ¶ 10).  The decision to promote Turner was made by Owens and

approved by DePalantino.  (Doc. 37 at ¶ 10); (Doc. 43 at ¶ 10).

On January 26, 2022, Owens issued Turner a written warning, which he

signed, for (1) failing to call the call-out line for his absences on January 13 to 14

and January 17 to 21 and (2) not taking any calls for over an hour on January 24,

despite showing an "available" status in Five9.  (Doc. 38-2 at 146); (Doc. 37 at ¶ 14);

(Doc. 43 at ¶ 14) (undisputed).  Turner was warned that any further policy

violations, including no-call/no-shows, incorrect Five9 statuses, or abuse of work

---

[3] There are numerous instances in the record where Turner failed to properly deny an assertion from Ensurem's statement of facts.  *See* Fed. R. Civ. P. 56(e), (e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the Court may . . . consider the fact undisputed for purposes of the motion. . . .").  Specifically, even though Turner "denied" an allegation, he failed to properly explain his denial as to the specific portions in the statement of facts. In this particular instance, Turner "denied" that his essential duties involved taking incoming calls to retain existing clients, but did not provide why Ensurem's statement was wrong or what his duties were.  Going forward, the Court will label these instances as "(undisputed)" where Turner does not specifically deny Ensurem's assertion of fact or otherwise provide an explanation as to why the assertion is incorrect.

[4] Turner also states that he had the option to call the call-out line or directly notify his supervisor.  (Doc. 43 at ¶ 12).  The Court will analyze that portion of the record in its analysis.

time, would result in a final warning or termination.  (Doc. 38-2 at 146); (Doc. 37 at ¶ 16); (Doc. 43 at ¶ 16).

On February 1, 2022, Owens reminded Turner again to call the call-out line before his shift started if he would be absent.  (Doc. 38-2 at 168); (Doc. 37 at ¶ 17); (Doc. 43 at ¶ 17) (undisputed).  Turner was absent the next day, and Ensurem alleges that Turner did not call the call-out line before the start of his shift.  (Doc. 37 at ¶ 17); (Doc. 43 at ¶ 17).  As a result, on February 4, 2022, Owens issued Turner a final written warning, which he signed.  (Doc. 38-2 at 147).  Owens warned Turner that he would be terminated if he did not call the call-out line before his shift started when absent, even if Owens approved the absence.  (*Id.*).  Owens texted Turner on January 20 and February 1, 2, and 4, reminding him to call the call-out line before his shift started if he was going to be absent (even if his absences were due to COVID-19).  (Doc. 38-2 at 167–69); (Doc. 37 at ¶ 33); (Doc. 43 at ¶ 33).

On February 28, 2022, Ensurem alleges that Turner left work one hour and 25 minutes early without permission.  (Doc. 37 at ¶ 18).  Turner testified that he combined his two 15-minute breaks and 30-minute lunch to leave work one hour early, and he was allowed to do so without Owens's approval.  (Doc. 43 at ¶ 18).

Between March 1 and 4, Ensurem alleges that Turner's call logs show that his total time making or receiving calls each day ranged from 2 hours and 16 minutes to 3 hours and 28 minutes.  (Doc. 38-4 at 43); (Doc. 37 at ¶ 19).  During that same period, Turner's Five9 records show that he spent 51% to 71% of each day in a "Not Ready" status.  (Doc. 38-4 at 43); (Doc. 37 at ¶ 19).  Turner claims that IT

6

problems hindered his ability to perform on those dates. (Doc. 43 at ¶ 19). On March 8, DePalantino and Owens spoke with Turner about the alleged early departure on February 28 and his call avoidance on March 1 to 4. (Doc. 37 at ¶ 20); (Doc. 43 at ¶ 20) (undisputed). DePalantino did not terminate Turner; instead, he issued him a verbal warning. (Doc. 38-4 at 6).

On March 28, 2022, Turner used 6.92 FMLA hours, thereby exceeding his FMLA leave entitlement (480 hours) by 4.27 hours. (Doc. 37 at ¶ 21); (Doc. 43 at ¶ 21). Brown informed Turner that same day that he had exhausted his FMLA leave. (Doc. 37 at ¶ 21); (Doc. 43 at ¶ 21). The next day, on March 29, Turner sent Brown an FMLA certification form, seeking further intermittent FMLA leave to care for his daughter. (Doc. 37 at ¶ 22); (Doc. 43 at ¶ 22). The request included a reduced schedule for Turner to care for his daughter starting on March 25, 2022. (Doc. 37 at ¶ 22); (Doc. 43 at ¶ 22). On March 29, 2022, Brown advised Turner that he had exhausted his 480 hours of FMLA leave, and he would not be eligible for FMLA leave until June 2022. (Doc. 37 at ¶ 23); (Doc. 43 at ¶ 23).

On May 18, 2022, Owens messaged Turner at 12:28 pm—two and a half hours after his shift started—stating that he had not made a call all day and that she "need[ed] calls to be a priority right now." (Doc. 38-2 at 159). Turner responded, "I gotcha wont happen again. Went to grab some coffee as well." (*Id.*). Two days later, Owens messaged Turner at 10:39 am, stating: "What can we do for you to make time for work. Your shift started 30 mins ago. . . I need you here for a meeting and your [(sic)] not here." (*Id.* at 160).

7

In May 2022, DePalantino was concerned that Turner was not available to take phone calls despite being logged into Five9. (Doc. 37 at ¶ 25); (Doc. 43 at ¶ 25). As a result, DePalantino asked Owens to send him Turner's call times and Five9 login times for May 16 to 20 and May 23 to 26, 2022, which she provided via email on May 27. (Doc. 37 at ¶ 25); (Doc. 43 at ¶ 25). Mistakenly, Owens sent Turner's records from May 2021 rather than May 2022. (Doc. 38-4 at 17); (Doc. 37 at ¶ 26); (Doc. 43 at ¶ 26). DePalantino testified that he noticed that Owens had mistakenly sent records from the incorrect period, but that prompted him to begin his own investigation to determine Turner's call logs for May 2022. (Doc. 38-4 at 18). Turner's call logs from May 16 to 20 and May 23 to 26, 2022 showed that his total time making or receiving calls and performing "After Call Work" each day ranged from 8 minutes and 22 seconds to 5 hours and 47 minutes. (Doc. 37 at ¶ 26); (Doc. 43 at ¶ 26) (undisputed). Turner argues that this time did not include his time manually calling. (Doc. 43 at ¶ 26).

Owens and DePalantino decided to propose to Turner that he switch to an hourly sales position because Turner was not meeting the requirements of the MSR II position: he was not logged on enough, taking enough calls, and he was leaving while on duty. (Doc. 38-6 at 25). Owens then scheduled a meeting with Turner for May 31, 2022, at 10:15 am. (Doc. 38-2 at 39, 162); (Doc. 38-6 at 25). At 10:16 am, Owens messaged Turner on Microsoft Teams, inviting him to join the meeting. (Doc. 38-2 at 161). Owens then texted Turner at 10:23 am, stating, "I have been trying to call you." (*Id.* at 163). Turner responded, stating, "Yeah, I had to leave

8

real quick to drop my daughter off.  Just forgot to change the aux code to meal. Whats going on [n]ow[?]" (*Id.*).  Owens tried calling Turner at 10:28 am.  (*Id.* at 164).  He did not answer.

Owens then notified Brown and DePalantino that Turner did not show up for the meeting.  (Doc. 38-4 at 20–21, 25).  Owens, Brown, and DePalantino then tried to contact Turner by calling his wife.  (Doc. 38-4 at 21); (Doc. 38-6 at 23).  Around 11am, Turner's wife answered, said Turner was "in the shower," and that he would call back.  (Doc. 38-6 at 23); (Doc. 38-4 at 21).  DePalantino testified that, later that day, he called Turner and terminated him from the position.  (Doc. 38-4 at 20); (Doc. 38-4 at 55).

On February 3, 2023, Turner dual-filed a charge of discrimination against Ensurem with the U.S. Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR").  (Doc. 37 at ¶ 32); (Doc. 43 at ¶ 32).  He alleged disability discrimination and retaliation claims under the ADA, but did not allege any Florida Civil Rights Act ("FCRA") claims or even mention the FCRA.  (Doc. 37 at ¶ 32); (Doc. 43 at ¶ 32).

Turner filed this case against Ensurem on November 21, 2023, alleging six counts.  (Doc. 1).  Turner alleged (1) discrimination based on disability in violation of the ADA ("Count I"), (2) ADA retaliation ("Count II"), (3) discrimination based on disability in violation of the FCRA ("Count III"), (4) FCRA retaliation ("Count IV"), (5) FMLA interference ("Count V"), and (6) FMLA retaliation ("Count VI").

9

Ensurem filed a motion for summary judgment.  (Doc. 37).  Turner responded (Doc. 43), and Ensurem replied (Doc. 47).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant can show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A district court must grant a motion for summary judgment only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Essex Ins. Co. v. Barrett Moving & Storage, Inc.*, 885 F.3d 1292, 1299 (11th Cir. 2018) (citation and internal quotation marks omitted).  An issue is "genuine" if a rational trier of fact, viewing all of the record evidence, could find in favor of the nonmoving party.  *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014) (citation omitted).  And a fact is "material" if, "under the applicable substantive law, it might affect the outcome of the case."  *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004) (citations omitted).

In ruling on a motion for summary judgment, courts must "resolve all ambiguities and draw reasonable factual inferences from the evidence in the non-movant's favor."  *Travelers Prop. Cas. Co. of Am. v. Moore*, 763 F.3d 1265, 1268 (11th Cir. 2014) (citation and internal quotation marks omitted).

The moving party bears "the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of 'the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has done so, the burden flips to the non-moving party to demonstrate the presence of a genuine dispute through citations to specific portions of the record. Fed. R. Civ. P. 56(c).  "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the Court may . . .  consider the fact undisputed for purposes of the motion. . . ."  Fed. R. Civ. P. 56(e), (e)(2).

When a nonmovant fails to address a movant's arguments in response to a summary judgment motion, the nonmovant abandons and waives that argument. *A.L. v. Jackson Cnty. Sch. Bd.*, 635 F. App'x 774, 787 (11th Cir. 2015) (a party waives claims by "failing to brief them, failing to respond to the [opposing party's] motion for summary judgment, and failing to bring to the court's attention evidence that supported [the] claims."); *see also Resol.  Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (finding that grounds not argued on summary judgment are deemed abandoned); *Bulluck v. Newtek Small Bus.  Fin., Inc.*, 808 F. App'x 698, 702 (11th Cir. 2020) (finding that the nonmovant "abandoned or waived" arguments "by failing to raise those arguments in response to [movants'] motions for summary judgment").  "A court may determine that an affidavit is a sham when it contradicts previous deposition testimony and the party submitting the affidavit does not give any valid explanation for the contradiction."  *Latimer v. Roaring Toyz, Inc.*, 601

11

F.3d 1224, 1237 (11th Cir. 2010); *see also Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.,* 736 F.2d 656 (11th Cir. 1984).

**DISCUSSION**

Ensurem argues that the undisputed record evidence confirms that Turner was terminated—after numerous warnings— for recurring performance issues, violations of company policies, and missed meetings.  (Doc. 37 at 1).  In support, Ensurem raises five arguments: (1) Turner has not exhausted his administrative remedies under the FCRA, (2) some of his ADA and FCRA allegations are time-barred, (3) Turner has not established a *prima facie* case of ADA discrimination and retaliation because he was not a "qualified individual" under the ADA and there were legitimate reasons for his termination, (4) Turner cannot establish a retaliation claim under the ADA or FCRA because his first request for FMLA leave was too remote from his termination and his supervisor did not know he requested a second FMLA leave when Turner was terminated, and (5) Turner cannot establish a FMLA interference claim because he was not denied FMLA leave as to his first request and he was not eligible for his second request.  (Doc. 37).  The Court will address each argument in turn.

## I.    Turner has exhausted his administrative remedies.

Ensurem first argues that Turner has not exhausted his administrative remedies under the FCRA because his EEOC Charge of Discrimination did not allege any violations of the FCRA or any Florida law.  (Doc. 37 at 13–14).  Ensurem first raised this argument in its motion to dismiss.  (Doc. 18 at 5–13).  There,

Ensurem cited several Florida District Courts of Appeal cases in support of its position that Turner's EEOC Charge did not give Ensurem fair notice of the claim. (*Id.*). Specifically, Ensurem argues that the Charge only alleged disability discrimination and did not mention any claim under the FCRA or Florida law. (*Id.*).

Ensurem stated in its motion that there was a split between the Second DCA and Fourth DCA. (*Id.* at 9–13). Specifically, the Fourth DCA held in *Belony v. N. Broward Hosp. Dist.*, 374 So. 3d 5 (Fla. 4th DCA 2023), that a plaintiff who charges only a violation of federal law, and omits any mention of Florida law, may not later assert a claim under Florida law. But the Second DCA found that the FCRA requires only that the charge include a short and plain statement of the facts describing the violation and relief sought. *Ramos v. Steak N Shake, Inc.*, 376 So. 3d 100, 104 (Fla. 2d DCA 2023). This Court deferred ruling on Ensurem's motion to dismiss because on April 9, 2024, the Florida Supreme Court granted certiorari to resolve the circuit split. *See Steak N Shake, Inc. v. Ramos*, No. SC2024-0099, 2024 WL 1550904, at * 1 (Fla. Apr. 9, 2024). Specifically, the Court held that Ensurem may renew its motion to dismiss after the Florida Supreme Court decides *Steak N Shake v. Ramos*. (Doc. 25).

On July 10, 2025, the Florida Supreme Court "approve[d] the decision of the Second District in *Ramos* to the extent it holds that the aggrieved party is not required to identify the FCRA in a dual-filed complaint that specifically references federal law to exhaust administrative remedies." *Steak N Shake, Inc. v. Ramos*, 415 So. 3d 107, 113 (Fla. 2025).

13

Recognizing the Florida Supreme Court's ruling in *Steak N Shake v. Ramos* and considering that Ensurem improperly raised this argument at the summary judgment stage[5], the Court finds that Turner has exhausted his administrative remedies.

## II.    Some of Turner's FCRA and ADA allegations are time-barred.

That said, the Court turns to Ensurem's second argument—that some of Turner's FCRA and ADA allegations are time-barred.  (*See* Doc. 37 at 14).  Most importantly, Turner did *not* respond to Ensurem's second argument.  (*See* Doc. 43). The Court finds Ensurem's second argument persuasive.

As stated, when a nonmovant fails to address a movant's argument in response to a summary judgment motion, the nonmovant waives that argument. *Jackson Cnty. Sch. Bd.*, 635 F. App'x at 787; *see also Dunmar Corp.*, 43 F.3d at 599; *Bulluck*, 808 F. App'x at 702.  Under the ADA, a plaintiff must file an EEOC charge within 300 days of the last alleged unlawful employment act in Florida.  *Maynard v. Pneumatic Products. Corp.*, 256 F.3d 1259, 1262 (11th Cir. 2001) (citation omitted); *see also Hardin v. Oakley Transp., Inc.*, 773 F. Supp. 3d 1320, 1337 (M.D. Fla.

---

[5] Specifically, the Court stated, "After the Florida Supreme Court decides *Steak N Shake, Inc. v. Ramos*, Ensurem may renew" its motion to dismiss. (Doc. 25 at 2).  But Ensurem raised the issue at the summary judgment stage.  Ensurem's summary judgment motion states, "For the reasons discussed in Ensurem's Motion to Dismiss Counts III and IV. . . *which are incorporated herein*, Plaintiff failed to exhausted his administrative remedies under the FCRA." (Doc. 37 at 13–14) (emphasis added).  But this Court's local rules do not permit the Court to incorporate by reference an argument from a separate motion. *See* M.D. Fla. Loc. R. 3.01(h) ("A motion . . . may not incorporate by reference all or part of any other motion, legal memorandum, or brief.").  The Court granted both Ensurem and Turner extra pages for briefing their summary judgment positions.  (Docs. 36, 42). Ensurem's incorporation by reference attempt skirts the generosity of the Court in granting such motion to exceed the page limits.  Therefore, the Court need not further analyze Ensurem's administrative remedies argument.

14

2025).  Under the FCRA, a charge must be filed within 365 days of the alleged FCRA violation.  Fla. Stat.  § 760.11(1).

"Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002).  Discrete retaliatory or discriminatory acts "'occurred' on the day that it 'happened' . . . . A party, therefore, must file a [timely] charge . . . or lose the ability to recover for it."  *Id.* at 110.

Here, Turner dual-filed a Charge of Discrimination with the EEOC and the FCHR on February 3, 2023.  (Doc. 38-2 at 158); (Doc. 37 at ¶ 32); (Doc. 43 at ¶ 32). Any alleged discriminatory or retaliatory act as to Turner's ADA claim needs to have occurred on or after April 9, 2022 (*i.e.,* 300 days before the filing of Turner's EEOC charge).  Therefore, any incidents of alleged discrimination that occurred before then—such as the January 26, 2022 and February 4, 2022 warnings, and DePalantino's alleged attempt to terminate Turner on March 8—are not actionable.

Likewise, any alleged discriminatory or retaliatory act as to Turner's FCRA claim needs to have occurred on or after February 3, 2022 (*i.e.,* 365 days before the filing of Turner's charge).  Accordingly, any discriminatory or retaliatory acts that occurred prior to February 3, 2022, are barred for the FCRA claim.

**III.   Turner has not pleaded a *prima facie* case of ADA or FCRA discrimination.**

Next, Ensurem argues that summary judgment on Counts I and III—the ADA and FCRA discrimination claims—should be granted.[6]  (Doc. 37 at 14–21). Specifically, Ensurem contends that Turner cannot establish a *prima facie* case of disability discrimination because Turner is not a "qualified individual" under the ADA and there were legitimate reasons for his termination.  (*Id.*).  Turner argues that he was a "qualified individual" because he could perform the essential functions of his MSR II position and that he was terminated for requesting FMLA leave.  (Doc. 43 at 10–18).  The Court finds that summary judgment is due to be granted on Counts I and III.

When evaluating an ADA claim against an employer, the Court applies the *McDonnell Douglas* burden-shifting framework.  *Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1215 (11th Cir. 2021); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  First, the employee must establish a *prima facie* case of disability discrimination.  *Akridge v. Alfa Ins.  Companies*, 93 F.4th 1181, 1191 (11th Cir. 2024).  The employee bears the initial burden to establish a *prima facie* case.  *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000).  "If the employee is successful in making a prima facie case, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its

---

[6] Because "claims under the [FCRA] are analyzed under the same framework as ADA claims," the Court considers Ensurem's request to grant summary judgment on Count III— Turner's FCRA disability discrimination claim— together with Count I.  *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1224 n.2 (11th Cir. 2005).

decision." *Akridge*, 93 F.4th at 1191. "The burden then shifts back to the employee to present sufficient evidence creating a genuine issue of material fact that the employer's reason is pretext for discrimination." *Id.*

To state a *prima facie* of discrimination under the ADA, Turner must show he was (1) disabled, (2) a "qualified individual" when he was terminated, and (3) terminated on account of his disability. *Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir. 2016) (citation omitted). Importantly, Ensurem does not dispute that Turner had a disability.[7] (*See* Doc. 37 at 15). Rather, the parties argue over whether Turner is a "qualified individual" and whether he was discriminated against because of his disability. (Doc. 37 at 15–21); (Doc. 43 at 10–18).

### A. Turner is not a "qualified individual."

The ADA provides, "No covered entity shall discriminate against a **qualified individual** with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (emphasis added). The statute defines "qualified individuals" as "individual[s] with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* § 12111(8); *see also, e.g., Davis v. Fla. Power & Light Co.,* 205 F.3d 1301, 1305 (11th Cir. 2000).

---

[7] Turner alleged that he had an adjustment disorder, depression, insomnia, confusion, and high blood pressure. (Doc. 38-2 at 48).

Put simply, Turner must show either he can perform the essential functions of his job without a reasonable accommodation, or, if he cannot, show that he can perform the essential functions of his job with a reasonable accommodation. *See Davis,* 205 F.3d at 1305. As such, if Turner is unable to perform an essential function of his MSR II position, even with an accommodation, he is not a "qualified individual" and not covered under the ADA. *See id.*

"Whether a function is essential is evaluated on a case-by-case basis by examining a number of factors." *Id.* "The ADA provides that consideration shall be given to the employer's judgment as to what functions of a job are essential and the employer's written description for that job." *Id.* (citing 42 U.S.C. § 12111(8)). Other evidence of an essential function includes: (1) the amount of time spent on the job performing the function, and (2) the consequences of not requiring the employee to perform the function. *See* 29 C.F.R. § 1630.2(n)(3).

Here, there is substantial *undisputed* record evidence that Turner could not perform the essential functions of his MSR II position. At the outset, the MSR II position required Turner to call customers, take incoming calls, call Ensurem's call-out line before his shift started when he would be absent, properly set his status in Five9, be logged onto Five9 for at least eight hours per day, and take calls for at least six and a half to seven hours per day. (Doc. 37 at ¶ 12). Turner does not dispute these requirements, as he failed to specifically deny them and provide an explanation. (Doc. 43 at ¶ 12) (undisputed); (*id.* at 11); (Doc. 44-3 at ¶ 8); *see* Fed. R. Civ. P. 56(e), (e)(2) ("If a party fails to properly support an assertion of fact or fails

18

to properly address another party's assertion of fact as required by Rule 56(c), the Court may . . . consider the fact undisputed for purposes of the motion. . . ."). Rather, Turner argues that there was an additional "unwritten" policy that he could notify his direct supervisor that he was absent instead of calling the call-out line. (*Id.* at ¶ 12). The Court will set that dispute aside for a brief moment.

The Court turns its focus to the undisputed record evidence demonstrating Turner's inability to perform the essential functions of his position. Turner's absenteeism and tardiness began during his tenure as a Call Center Agent. (Doc. 37 at ¶ 13); (Doc. 43 at ¶ 13). Specifically, Turner received a written warning on April 28, 2021, from his then-supervisor for being absent, tardy, or leaving work early six times in three weeks. (Doc. 38-2 at 145); (Doc. 37 at ¶ 13); (Doc. 43 at ¶ 13). This is undisputed and occurred prior to Turner's first request for FMLA leave on June 3, 2021, which Ensurem approved. (Doc. 37 at ¶ 8); (Doc. 43 at ¶ 8). Even though Turner received a warning for not showing up to work and being late, Ensurem promoted Turner to MSR II. (Doc. 37 at ¶ 10); (Doc. 43 at ¶ 10).

But Turner's troubles with tardiness and absenteeism did not end following the April 28, 2021, warning. On January 26, 2022, Owens issued Turner a second written warning for (1) failing to call the call-out line while he was absent on January 13–14, and 17–21, 2022, and (2) not taking any calls for over an hour on January 24, despite listing himself as "available" in Five9. (Doc. 38-2 at 146); (Doc. 37 at ¶ 14). Turner does not dispute his absence or that he did not make any calls for over an hour on January 24. (Doc. 43 at ¶ 14) (undisputed); *see also* Fed. R. Civ.

P. 56(e), (e)(2).  Rather, he argues that he was ill from COVID-19 and that he called
or texted Owens to notify her that he would be absent.  (Doc. 43 at ¶ 14).  He further
argues that Owens did not require other co-workers to use the call-out line when
they were sick from COVID-19.[8]  (*Id.*).  But Turner fails to point towards any
credible evidence that he texted or called Owens.  (*Id.*).  Turner's lone citation is his
own affidavit—filed with his response—stating that he only needed to notify his
supervisor when he was absent.  (Doc. 44-3 at ¶ 8).  But this self-serving assertion
conflicts with his own testimony.

The record evidence shows that Turner *may have*[9] called the call-out line for
his January 13 to 14 absences, but he did not call for January 17 to 21.  (Doc. 38-2
at 16).  He testified that he was abiding by an employee handbook policy that
someone did not have to call the call-out line "as long as you're calling in one of the
times and [Ensurem] knows what's going on. . . ."  (*Id.*).  When asked, Turner could
not point to a handbook policy to support his assertion.  (*Id.*).  Contrary to his
statement in the affidavit, Turner testified that he was trained "to call the call-out
line when [he was] absent. . . ."  (*Id.*).  Owens and Turner exchanged text messages
about the importance of calling the call-out line and the requirement that Turner

---

[8] Turner's affidavit claims that co-worker Teresa Payne had COVID-19 and was not
disciplined for failing to call the call-out line when she was absent.  (Doc. 44-9).  But Payne
testified that she did, in fact, call the call out line.  (Doc. 38-7 at 8).  The Court finds
Turner's claim unpersuasive because his affidavit conflicts with Payne's testimony and it
does not give any valid explanation for the contradiction between Turner's claim that Payne
did not call the call-out line and her deposition testimony claiming that she did so.
*See Latimer*, 601 F.3d at 1237 (11th Cir. 2010); *see also Van T. Junkins*, 736 F.2d 656.
[9] The only record evidence to suggest that Turner called the call out-line for his January
13–14, 2022, absences was his own self-serving testimony (Doc. 38-2) and affidavit filed
with his response (Doc. 44-3 at ¶ 9).

20

must do so.  (Doc. 38-2 at 47, 167–68).  Specifically, Owens texted Turner, "I got in a lot of trouble [because] 2 people have been out for over a week and no one submitted time in adp."  (Doc. 38-2 at 167).  In text messages between Owens and Turner, Turner admitted that he did not call out during "the covid week".  (Doc. 38-2 at 168).  After reviewing the facts and record evidence, the record demonstrates that Turner did not show up for work on January 13, 14, and 17 to 21, 2022, did not call the call-out line when required and did not take calls for over an hour on January 24.  He was further warned as early as January 20, 2022, that he must call the call-out line if he was absent from work.  (Doc. 38-2 at 167).

Turner's work troubles continued into February 2022.  On February 1, 2022, Owens reminded Turner via text to call the call-out line if he was going to be absent from work.  (Doc. 38-2 at 168).  Turner responded, "Yes, I call every day."  (*Id.*).  Turner was then absent the next day on February 2, 2022.  (Doc. 38-2 at 19); (Doc. 37 at ¶ 17); (Doc. 43 at ¶ 17) (undisputed as to absence).  Turner disputes Ensurem's claim that he did not call the call-out line.  (Doc. 43 at ¶ 17).  But Turner's own testimony confirms that he did not call the call-out line before his shift started and that he may have called it "sometime that day".  (Doc. 38-2 at 20).  Turner testified that he received training that he must call the call-out line "*prior* to any absences".  (Doc. 38-2 at 20) (emphasis added).  Turner's behavior also conflicts with Ensurem's handbook policy, which states that employees may be terminated for failure to "call in for a scheduled shift without prior approval."  (Doc. 38-2 at 138).

Owens then issued Turner a final warning on February 4, 2022.  (Doc. 38-2 at 147).  The warning indicated that Turner did not report to work on February 2, did not call the call-out line, and that Turner received a written warning on January 26, 2022, for a no-call, no-show to work.  (*Id.*).  The warning further stated that "Any further . . . instances regardless of notifying your supervisor, will be met with termination in accordance with Ensurem policies."  (*Id.*).  Turner signed the warning.  (*Id.*).

On February 28, 2022, Turner left work one hour and 25 minutes early.  (Doc. 37 at ¶ 18); (Doc. 43 at ¶ 18) (undisputed as to the timing).  Ensurem argues that Turner left early without permission.  (Doc. 37 at ¶ 18).  Turner argues that, like other coworkers, he used his two 15-minute breaks and his 30-minute lunch break to leave work early.  (Doc. 43 at ¶ 18).  But Turner's testimony is conflicting.  First, he states that everyone at the office was allowed to flex their break times as they saw fit.  (Doc. 38-2 at 22).  Essentially, he first testifies that he did not need permission to combine his 15-minute breaks along with his 30-minute lunch break to leave early.  (*Id.*).  Later, Turner testified that although the managers allowed employees to flex their time, employees should notify their supervisors.  (Doc. 38-2 at 53).  He then backtracked and stated that he did not need to notify a supervisor.  (*Id.*).  Setting aside the conflicting testimony, Turner does not dispute that he left work 1 hour and 25 minutes early, despite having only two 15-minute breaks and one 30-minute break, totaling only one hour, which is less than the 1 hour and 20

22

minutes that he had left work early.  (Doc. 37 at ¶ 18); (Doc. 43 at ¶ 18); *see* Fed. R. Civ. P. 56(e), (e)(2).

Ensurem attached an exhibit of Turner's call logs between May 1 to 4, 2022. (Doc. 38-2 at 149–150).  Ensurem claims that Turner's total time spent making or receiving calls each day ranged from 2 hours and 16 minutes to 3 hours and 28 minutes, rather than the 6.5 to 7 hours per day guideline.  (Doc. 37 at ¶¶ 12, 19); (Doc. 43 at ¶ 12).  Turner does not dispute that call logs displayed this information. (Doc. 43 at ¶ 19).  Instead, he argues that he could not log into Five9 due to system errors, that other employees had similar issues, and that his call logs were not much different from theirs.  (*Id.*).  Importantly, DePalantino testified that Turner did not provide any explanation as to why he was in "not available" status.  (Doc. 38-4 at 11).  DePalantino also had a phone call with Turner, stating that his call times during March 1–4 were unacceptable.  (*Id.*).  That said, DePalantino testified that he did not terminate Turner because there was "some truth" to the fact that his call logs during that timeframe were not far enough out of the "norms" of other employees.  (*Id.*).  Ultimately, DePalantino gave Turner a verbal warning and told him he was contemplating terminating Turner.  (*Id.* at 6).

On May 18, 2022, at 12:28pm, Owens messaged Turner via a Teams message stating, "[I] need calls to be a priority right now.  [Y]ou know [D]ave and [N]orm are watching the dialer listening to calls and you ghost.  [N]ot one call all day.  I call you no answe[r]."  (Doc. 38-2 at 159).  Turner responded, "I gotcha wont happen

again.  Went to grab some coffee as well.  I gotcha." (*Id.*).  Thus, it is undisputed that Turner was not readily available for phone calls on May 18, 2022.

Two days later, on May 20, 2022, Owens messaged Turner again stating, "What can we do for you to make time for work.  Your shift started 30 min[utes] ago.  Like, I need you here for a meeting and your [(sic)] not here." (*Id.* at 160).  Turner responded, "I had to go pick up my daughter from a therapy appointment.  I'm trying to work this thing out not having FMLA.  [B]are with me here." (*Id.*).

On May 26, 2022, Owens messaged Turner, saying, "you are killing me," along with a screenshot showing that Turner logged only 13 hours, 57 minutes, and 40 seconds of call time for the entire week of May 23, 2022.  (Doc. 38-2 at 161).  The next day, Owens messaged him "[I] really need you here today for your entire shift making calls[.]" (*Id.*).

DePalantino was concerned that Turner was not available to take phone calls despite being logged into Five9.  (Doc. 37 at ¶ 25); (Doc. 43 at ¶ 25).  As a result, DePalantino asked Owens to send him Turner's call logs for May 16 to 20 and May 23 to 26, 2022.  (Doc. 37 at ¶ 25); (Doc. 43 at ¶ 25).  Owens provided the email to DePalantino on May 27.  (Doc. 37 at ¶ 25); (Doc. 43 at ¶ 25).  Mistakenly, Owens sent Turner's records from May 2021 rather than May 2022.  (Doc. 38-4 at 17); (Doc. 37 at ¶ 26); (Doc. 43 at ¶ 26).  DePalantino testified that he noticed that Owens mistakenly sent records from the incorrect time period, but that prompted him to begin his own investigation to review Turner's call logs for May 2022.  (Doc. 38-4 at 18).

24

He then reviewed Turner's May 2022 records. (Doc. 38-4 at 25). Specifically, he reviewed Turner's Five9 status, number of calls, time he would spend on the calls, and the time Turner was available. (*Id.*). The call logs he reviewed were attached to his deposition transcript. (*See* Doc. 38-4 at 61–78). There, it was determined that, on May 16, 2022, Turner had logged just 8 minutes and 22 seconds worth of call time. (Doc. 38-1 at 4). On May 17, 2022, Turner logged 2 hours, 22 minutes, and 46 seconds. (*Id.*). On May 18, 2022, Turner had 3 hours, 51 minutes, and 10 seconds worth of call time. (*Id.*). On May 20, 24, 25, and 26, Turner's call log shows that he was well below the 6.5-hour time requirement imposed by Ensurem. (*Id.* at 5).

Owens and DePalantino decided to propose to Turner that he switch to an hourly sales position because Turner was not meeting the requirements of the MSR II position, he was not logged on enough, taking enough calls, and he was leaving while on duty. (Doc. 38-6 at 25). Owens then scheduled a meeting with Turner for May 31, 2022, at 10:15am. (Doc. 38-2 at 39); (*id.* at 162); (Doc. 38-6 at 25). At 10:16am, Owens messaged Turner on Microsoft Teams, inviting him to join the meeting. (Doc. 38-2 at 161). Owens then texted Turner at 10:23 am, stating, "I have been trying to call you." (*Id.* at 163). Turner responded, stating, "Yeah, I had to leave real quick to drop my daughter off. Just forgot to change the aux code to meal. Whats going on [n]ow[?]" (*Id.*). Owens tried calling Turner at 10:28am. (*Id.* at 164). He did not answer.

25

Owens then notified Brown and DePalantino that Turner did not show up for the meeting. (Doc. 38-4 at 57); (Doc. 38-4 at 20–21). Owens, Brown, and DePalantino then tried to contact Turner by calling his wife. (Doc. 38-4 at 21); (Doc. 38-6 at 23). Around 11am, Turner's wife answered, said Turner was "in the shower," and would call back. (Doc. 38-6 at 23); (Doc. 38-4 at 21). DePalantino testified that, later that day, he called Turner and terminated him from the position. (Doc. 38-4 at 20); (Doc. 38-4 at 55).

Taking the above findings in the light most favorable to Turner, the record evidence demonstrates that Mr. Turner was unable to perform the essential functions of his MSR II position. As stated, the MSR II position required Turner to call customers, take incoming calls, call Ensurem's call-out line before his shift started when he was absent, properly set his status in Five9, be logged onto Five9 for at least eight hours per day, and take calls for at least six and a half to seven hours per day. While Turner argues that he was a qualified employee because he was able to perform *some* parts of the position, the record evidence demonstrates that, as explained above, he did not show up to work on time, did not abide by the call-out procedures even after receiving warnings, and failed to perform other essential functions of his position. The record does not demonstrate that Turner asked for any reasonable accommodation other than his FMLA leave and "flexing" his break times.

That said, Turner fails to identify, nor has the Court found, any reasonable accommodations that Turner requested that would have assisted him with showing

26

up to work on time, taking calls, and otherwise being available for the essential functions of the position.  This is not surprising; such activities are essential functions of the job.  *See Powell v. Pinellas Cnty.*, No. 8:22-CV-577-SDM-AEP, 2023 WL 4419730, at *4 (M.D. Fla. July 10, 2023) ("An employee is not a 'qualified individual' if 'for reasons unrelated to his disability—such as a poor work ethic, carelessness, bad attitude, insubordination or unprofessional demeanor—the employee is 'not qualified for the job or is unable to perform the job's essential functions or fulfill the requirements of the position as prescribed by the employer or 'fails to meet his employer's expectations.'") (citation altered and quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 862 (7th Cir. 2005)).

**B.   Turner has not established a convincing mosaic of circumstantial evidence of discrimination.**

Turner argues that he has established a convincing mosaic of circumstantial evidence to support his discrimination claim.  (Doc. 43 at 12–13).  Certainly, even if the claims fail under the *McDonnell Douglas* framework, "a plaintiff will always survive summary judgment if he presents . . . a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination."  *Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1185 (11th Cir. 2019) (citation and internal quotations omitted).  A "convincing mosaic" may be shown by evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements . . ., and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3)

27

that the employer's justification is pretextual." *Id.* (citation and internal quotations omitted).

Turner offers no evidence or argument of ambiguous statements or suspicious timing. Instead, he relies only on evidence of comparators and pretextual justification. But Turner has not presented sufficient evidence of either. For comparators, Turner argues that Ms. Owens allowed other employees to combine their breaks and lunch at the beginning or end of their shift and that the members of Ms. Owens' team typically did so. (Doc. 43 at 12–13) (citing Doc. 44-3 at 4). To establish a convincing mosaic, evidence of similarly situated employees need not be "strict comparators." *Akridge*, 93 F.4th at 1198 (quotation omitted). Still, Turner must offer some factual comparison between himself and those he claims were treated differently. *McCray v. Fla. Gypsum, LLC*, No. 6:23-CV-1567-JSS-RMN, 2025 WL 1489826, at *9 (M.D. Fla. May 23, 2025) (citing *Robert v. City of Boca Raton, Fla.*, No. 21-13779, 2024 WL 3066604, at *5 (11th Cir. June 20, 2024)); *see Jones v. Spherion Atl. Enter., LLC*, 493 F. App'x 6, 9 (11th Cir. 2012) (holding that the plaintiff's statements that her supervisor "rudely reprimanded [black women] for violations[ ] while ignoring the same violations of white women even after the white women's violations were pointed out to him" and "singled out black women" were "conclusory . . . and contain[ed] no specific details," thus "fall[ing] short of creating a genuine issue of material fact").

And Turner cannot show that Ensurem's reasons for termination were pretextual. "[A] reason cannot be proved to be a pretext *for discrimination* unless it

28

is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original) (quotation omitted); *Akridge*, 93 F.4th at 1196 (same). "[A] plaintiff's failure to rebut *even one* nondiscriminatory reason is sufficient to warrant summary judgment for the employer." *Smelter v. S. Home Care Servs. Inc.*, 904 F.3d 1276, 1290–91 (11th Cir. 2018) (emphasis added) (citation omitted). Ensurem states that it terminated Turner after he missed a May 31, 2022, meeting. (Doc. 37 at ¶¶ 28–30). Turner does not allege that this reason is false. In fact, Turner admits it is true that he failed to attend the May 31, 2022, meeting. (Doc. 44-7 at 39–43). Therefore, Plaintiff has not established a convincing mosaic of disability discrimination.

Accordingly, the Court finds that summary judgment is due to be granted on Count I—the ADA discrimination claim. The Court also grants summary judgment on Count III—the FCRA discrimination claim. *See* supra n.4; *see also D'Angelo*, 422 F.3d at 1224 n.2.

## IV.   Turner has not pleaded a *prima facie* case of ADA, FCRA, or FMLA retaliation.

Next, Ensurem argues that summary judgment on Counts II, IV and VI—the retaliation claims under the ADA, FCRA, and FMLA—should be granted. (Doc. 37 at 22–27). Specifically, Ensurem contends that Turner cannot establish a *prima facie* case of retaliation under the ADA, FCRA and FMLA. (*Id.*). Turner argues that Ensurem terminated him for using his approved FMLA leave. (Doc. 43 at 16–

29

24).  The Court finds that summary judgment on Counts II, IV, and VI is due to be granted.

Turner's three retaliation claims under the ADA, FCRA, and FMLA are evaluated under the same *McDonnell Douglas* burden-shifting framework mentioned above.  *Todd*, 998 F.3d at 1219; *Matamoros v. Broward Sheriff's Off.*, 2 F.4th 1329, 1337 (11th Cir. 2021); *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1207 (11th Cir. 2001).  The employee first bears the initial burden of establishing a *prima facie* case.  *Akridge*, 93 F.4th at 1191; *Davis*, 205 F.3d at 1305.  "If the employee is successful in making a prima facie case, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its decision."  *Akridge*, 93 F.4th at 1191.  "The burden then shifts back to the employee to present sufficient evidence creating a genuine issue of material fact that the employer's reason is pretext for discrimination."  *Id.*

To establish a *prima facie* case of retaliation under the ADA, FCRA, and FMLA, a plaintiff must show: (1) statutorily protected expression; (2) adverse employment action; and (3) a causal link between the protected expression and the adverse action.  *Todd*, 998 F.3d at 1219; *Matamoros*, 2 F.4th at 1336; *Strickland*, 239 F.3d at 1207.

### A. Turner's ADA and FCRA retaliation claims.

First, Turner argues that he was engaged in a protected activity under the ADA because he requested FMLA leave and that Owens and DePlanatino "targeted him and treated him differently from other employees who did not have FMLA-

protected leave. . . ." (Doc. 43 at 16–19). But Turner misinterprets the distinction between a claim under the ADA and one under the FMLA. The difference is: "[A]n employee seeking FMLA leave is by nature arguing that he *cannot* perform the functions of the job, while an employee requesting a reasonable accommodation communicates that he *can* perform the essential functions of the job." *Acker v. Gen. Motors, LLC*, 853 F.3d 784, 791–92 (5th Cir. 2017) (emphasis in original). Put simply, Turner cannot simultaneously argue that he must be granted intermittent leave because he cannot perform essential job functions *and* that he is a "qualified individual" because he can perform essential job functions. *See Williams v. Kaiser Found. Health Plan of Georgia, Inc.*, No. 1:22-CV-02744, 2024 WL 1377645, *4 (N.D. Ga. Mar. 31, 2024). And, "FMLA leave is not a reasonable accommodation under the ADA; rather, it is a right enforceable" under a separate statute. *Id.*

Here, Turner makes such a simultaneous argument that he should have been granted FMLA leave because he cannot perform essential functions and, at the same time, that he was requesting a reasonable accommodation as a qualified individual so that he could perform essential functions. The Court already found that Turner is not a qualified individual under the ADA. *See supra*, Section (III)(A). That aside, the Court turns to Turner's argument that he was "targeted" by Owens and DePalantino. Ensurem alleges that Turner "admits he never complained of disability discrimination or retaliation to Ensurem's HR department or management." (Doc. 37 at ¶ 36). Turner does not dispute this assertion. (Doc. 43 at ¶ 7); *see also* Fed. R. Civ. P. 56(e), (e)(2) ("If a party fails to properly support an

31

assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the Court may . . . consider the fact undisputed for purposes of the motion. . . .").  Turner's testimony confirms that he never complained to HR about any discrimination or retaliation.  (Doc. 38-2 at 55).

Accordingly, because Turner failed to properly dispute Ensurem's claim that he never complained of disability discrimination and he first raised this issue at the summary judgment stage, the Court finds that summary judgment is due to be granted on Count II.  Summary judgment shall also be granted on Count IV because "claims under the [FCRA] are analyzed under the same framework as ADA claims. . . ." *See D'Angelo,* 422 F.3d at 1224 n.2; *see also Monroe v. Fla. Dep't of Corr.*, 793 F. App'x 924, 928 (11th Cir. 2019) (citation omitted).

### B. Turner's FMLA retaliation claim.

Second, Ensurem argues that summary judgment should be granted as to Count VI—Turner's FMLA retaliation claim.  (Doc. 37 at 23–27).  Specifically, Ensurem contends that Turner cannot establish a causal connection between his first request for FMLA leave and the written warnings/termination.  (*Id.* at 23–25). Ensurem further states that Turner cannot establish a causal link between his second request for FMLA leave and his termination.  (*Id.* at 25–27).  In response, Turner argues that Ensurem has engaged in a pattern or practice of retaliation toward employees seeking to use FMLA leave and that there was a causal connection between his first request for FMLA leave and the written warnings and termination.  (Doc. 43 at 21–32).  Turner also contends that there is a close

32

temporal proximity between his second request for FMLA leave and his termination. The Court finds that summary judgment is due to be granted on Count VI—Turner's FMLA retaliation claim.

As stated, a *prima facie* case of FMLA retaliation requires a showing that the employee engaged in statutorily protected conduct, the employee suffered an adverse employment action, and there is a causal connection between the two. *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1234 (11th Cir. 2010) (citation omitted). "The causal connection element is satisfied if a plaintiff shows that the protected activity and adverse action were not wholly unrelated." *Id.* (citation and internal quotation marks omitted). "To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct." *Glover v. Donahoe*, 626 F. App'x 926, 931 (11th Cir. 2015). "Temporal proximity alone, however, is not sufficient to establish a causal connection when there is unrebutted evidence that the decision maker was not aware of the protected activity. *Krutzig*, 602 F.3d at 1235 (citation omitted). "Furthermore, knowledge on the part of persons other than a decision maker cannot be imputed from other supervisors to the decision maker for purposes of an FMLA retaliation claim." *Id.* (citation omitted).

Here, Turner cannot establish a causal connection between his first request for FMLA leave and his written warnings and termination. Specifically, Turner requested FMLA leave on June 3, 2021. (Doc. 37 at ¶ 8); (Doc. 43 at ¶ 8). Turner's first warning for tardiness and absenteeism occurred on April 28, 2021. (Doc. 38-2

33

at 145); (Doc. 37 at ¶ 13); (Doc. 43 at ¶ 13).  His subsequent warnings occurred on January 26, 2022, and February 4, 2022.  (Doc. 38-2 at 146–147).  He was terminated on May 31, 2022.  (Doc. 38-4 at 55).  There were approximately 7 months between Turner's first request for FMLA leave and his subsequent warning on January 26, 2022.  The Eleventh Circuit has held that a three-to-four-month gap between the statutorily protected expression and the adverse employment action is too remote to create an inference of causation.  *Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1273 (11th Cir. 2017) (citation omitted).  Therefore, a 7-month gap is insufficient to establish a *prima facie* case of FMLA retaliation based on temporal proximity.[10]

That aside, the Court considers whether Turner has pleaded a *prima facie* case of FMLA retaliation as to his second request for FMLA leave.  Turner submitted his second FMLA leave request on March 29, 2022.  (Doc. 38-2 at 51).  Turner argues that his second request and his termination, which occurred on May 31, 2022, establish a close temporal proximity for causation.  (Doc. 43 at 23–24).  But Turner's argument is unpersuasive.  Eleventh Circuit precedent is clear that the decision maker must be aware of the protected activity, and knowledge from

---

[10] The Eleventh Circuit has held that temporal proximity should be measured from the last day of an employee's FMLA leave.  *Jones*, 854 F.3d at 1272 (citation omitted).  That said, Turner's argument did not focus on the temporal proximity between his last day of FMLA leave and his termination.  (Doc. 43 at 21–24).  Rather, Turner's focus was on the date of his first request for FMLA leave and whether Ensurem engaged in a pattern or practice of retaliation.  (*Id.*).  Because Turner did not argue temporal proximity between the last day of FMLA leave and his termination, the Court considers that argument waived.  *See Bulluck*, 808 F. App'x at 702 (finding that the nonmovant "abandoned or waived" arguments "by failing to raise those arguments in response to [movants'] motions for summary judgment").

other supervisors cannot be imputed to the decision maker for purposes of an FMLA retaliation claim. *Krutzig*, 602 F.3d at 1235 (citation omitted).

Here, the undisputed record evidence confirms that senior VP DePalantino was the decision-maker who terminated Turner, and he was unaware that Turner had made a second FMLA request on March 29, 2022. (Doc. 38-4 at 6); (Doc. 37 at ¶¶ 30–31); (Doc. 43 at ¶ 30–31) (undisputed); *see also* Fed. R. Civ. P. 56(e), (e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the Court may . . . consider the fact undisputed for purposes of the motion. . . ."). Turner attempts to argue that Brown and Owens were aware of Turner's second request for FMLA leave and that their opinions contributed to DePalantino's decision to terminate Turner. (Doc. 43 at ¶ 31). But this flies in the face of binding Eleventh Circuit precedent, which holds that knowledge of others cannot be imputed to the decision maker. *Krutzig*, 602 F.3d at 1235 (citation omitted).

Last, the Court addresses Turner's pattern or practice of retaliation argument. (Doc. 43 at 21–23). Upon review of the amended Complaint, Turner did not raise a pattern or practice theory and cannot now recast his FMLA retaliation claim as a pattern or practice claim at the summary judgment stage. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint.... A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").

Accordingly, the Court finds that summary judgment is due on Count VI because Turner has not pleaded a *prima facie* case of FMLA retaliation with respect to his first and second requests for FMLA leave.

## V.      Ensurem has shown that summary judgment is due to be granted on Turner's FMLA Interference claim.

Ensurem next argues that summary judgment should be granted on Count V—Turner's FMLA interference claim.  (Doc. 37 at 27–30).  Ensurem contends that Turner cannot show he was denied any FMLA leave benefit for his first FMLA request because Ensurem granted him FMLA leave and even allowed him to exceed his FMLA benefits.  (*Id.*).

Additionally, Ensurem argues that Turner cannot establish an interference claim on his second request for FMLA leave because (1) he had already exhausted his FMLA leave for the year as to his first request, (2) he was not eligible for further FMLA leave until June 2022, and (3)  his request for FMLA leave does not insulate him from termination unrelated to FMLA.  (*Id.*).  Turner argues that Ensurem interfered with his ability to take FMLA-protected leave because he was terminated shortly before he would have become eligible for additional FMLA leave.  (Doc. 43 at 18–21).  The Court finds that summary judgment is due to be granted on Count V.

"An interference claim occurs when an employer interferes with, restrains, or denies the exercise or attempted exercise of FMLA rights or benefits."  *Hogancamp v. Cnty. of Volusia*, 316 F. Supp. 3d 1354, 1358 (M.D. Fla. 2018).  To establish an interference claim, "an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied."  *Strickland*, 239 F.3d at 1206–

36

07. The employee need not allege that his employer intended to deny the benefit, because "the employer's motives are irrelevant." *Id.* at 1208.

"[T]he right to commence FMLA leave is not absolute." *Krutzig*, 602 F.3d at 1236. "[A]n employee can be dismissed, preventing [him] from exercising [his] right to commence FMLA leave, without thereby violating the FMLA, if the employee would have been dismissed regardless of any request for FMLA leave." *Id.*

Here, the Court agrees with Ensurem that Turner cannot demonstrate he was denied FMLA leave for his first request. As stated, Turner made his first request for FMLA leave on June 3, 2021, which Ensurem approved. (Doc. 38-2 at 170–73); (Doc. 37 at ¶ 8); (Doc. 43 at ¶ 8). Turner then used all twelve weeks of FMLA leave, and it is undisputed that Ensurem allowed Turner to exceed his FMLA leave by 4.27 hours. (Doc. 37 at ¶ 21); (Doc. 43 at ¶ 21). The undisputed record evidence demonstrates that Turner received FMLA benefits for his first request, and he cannot now allege discrimination for a benefit he already received. Therefore, Ensurem has demonstrated that it did not interfere with Turner's first request for FMLA leave. *See Munoz v. Selig Enterprises, Inc.*, 981 F.3d 1265, 1275 (11th Cir. 2020) ("Because the employee received all the leave [he] requested, this Court held [he] had 'not demonstrated that [he] suffered any damages as a result of [employer's] actions' and thus could not recover under the FMLA.") (citation omitted).

Next, the Court finds that Ensurem did not interfere with Turner's second request for FMLA leave. As stated, an employee can be dismissed without violating

37

the FMLA if the employee would have been dismissed regardless of any FMLA leave request. *Krutzig*, 602 F.3d at 1236. Here, the undisputed record evidence is clear that DePalantino, the decision-maker, was unaware of Turner's second request for FMLA leave when Turner's employment was terminated. (Doc. 38-4 at 6); (Doc. 37 at ¶¶ 30–31); (Doc. 43 at ¶ 30–31) (undisputed). Thus, it is clear that DePalantino intended to terminate Turner regardless of any request for FMLA leave because DePalantino was unaware of such a request. Accordingly, the Court finds that summary judgment on Count V—Turner's FMLA interference claim—is due to be granted.

## CONCLUSION

Ensurem's Motion for Summary Judgment (Doc. 37) is **GRANTED**. The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant and against Plaintiff, terminate any pending deadlines, deny any pending motions as moot, and close the file.

**IT IS ORDERED** in Tampa, Florida, on June 11, 2026.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE